10/20/04                                    T DW - CUM

<u>Knowles v. Visa U.S.A. Inc.</u>, Docket No. CV-03-707

Since the court heard oral argument on defendants' motion to dismiss and took that motion under advisement, counsel for defendants have sent a number of letters to the court submitting various decisions from other state trial courts. Plaintiffs' counsel have not objected to any of these submissions. On October 15, 2004 plaintiffs' counsel filed a motion for leave to submit supplemental authorities, enclosing materials from pending cases in New Mexico and Minnesota. Defendants do not object to this motion but have submitted a response commenting on plaintiffs' submissions.

Plaintiffs' motion for leave to submit supplemental authorities is granted. For the record, the court's view is that parties should be permitted to submit copies of decisions from other courts that they contend are relevant to the issues pending before this court. However, to avoid any perceived need for responsive filings, all parties submitting decisions from other courts should limit themselves to directing the court's attention to the portions of the decisions that they contend are relevant and should refrain from any argument or commentary on the import of those decisions.

October 20, 2004

Thomas D. Warren
Justice, Superior Court

DONALD L. GARBRECHT
LAW LIBRARY

NOV 15 2004

STATE OF MAINE
Cumberland, ss

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-03-707

CATHERINE J. KNOWLES, et al,

Plaintiffs

v.

ORDER

VISA U.S.A. INC., et al,

Defendants

This action is brought by plaintiffs Catherine J. Knowles and Diane Roberts, suing on behalf of themselves and a proposed class of all similarly situated Maine consumers, against defendants Visa U.S.A. Inc. and MasterCard International Inc. alleging violations of Maine's antitrust statutes, 10 M.R.S.A. §§1101, 1104 (1996). Before the court is defendants' motion to dismiss on the ground that plaintiffs lack standing for purposes of the antitrust laws.

1.    The Wal-Mart Class Actions

This action follows on the heels of the settlement of a group of antitrust class actions brought in the U.S. District Court for the Eastern District of New York styled In re Visa Check/MasterMoney Antitrust Litigation, No. 96-CV-5238 (JG) (E.D.N.Y.) also known as Wal-Mart Stores, Inc., et al v. Visa U.S.A. Inc., et al. (the "Wal-Mart class actions")

The Wal-Mart class actions were brought by merchants who asserted that they had been harmed by defendants' requirement that merchants had to accept Visa and

MasterCard debit cards in order to be allowed to accept Visa and MasterCard credit cards. The merchants alleged that this constituted an illegal tying arrangement in violation of the antitrust laws.

In February 2000 the federal district court granted class certification to a national class consisting of all merchants who accepted Visa or MasterCard credit cards and consequently had been required to accept Visa or MasterCard debit cards. In re Visa Check/MasterMoney Antitrust Litigation, 192 F.R.D. 68, 90 (E.D.N.Y. 2000). In October 2001 the district court's class certification order was affirmed by the U.S. Court of Appeals for the Second Circuit. 280 F.3d 124 (2d Cir. 2001), cert. denied, 536 U.S. 917 (2002).

On April 11, 2003 the federal district court denied a motion for summary judgment by Visa and MasterCard and granted partial summary judgment to the class plaintiffs on a number of specific issues. In re Visa Check/MasterMoney Antitrust Litigation, 2003 U.S. Dist. LEXIS 4965, 7-12 (E.D.N.Y. 2003). The court concluded, however, that issues of disputed fact remained, inter alia, on issues "that lie at the heart of the merchants' [Sherman Act] claims: whether Visa and MasterCard's Honor All Cards rules harmed competition in the debit card services market, and whether the defendants acted together to produce that result." Id. at 19.

On April 30, 2003, on the eve of trial, the parties reached a settlement of the Wal-Mart class actions. This settlement was ultimately approved by the district court in December 2003. In re Visa Check/MasterMoney Antitrust Litigation, 297 F.Supp.2d 503 (E.D.N.Y. 2003). The settlement involved a payment to the class of more than $3 billion plus injunctive relief preventing Visa and MasterCard from tying debit and credit cards in the future. In approving the settlement and awarding $220 million in attorneys fees, the district court noted that this constituted "the largest antitrust settlement in history,"

297 F.Supp.2d at 508, and further noted that in addition to the $3 billion to be paid in settlement, the injunctive relief that had been agreed to was estimated to result in future savings of $25 billion to $87 billion. Id. at 511.[1]

2.    The Consumer Class Actions

Once the merchants' class had been settled, consumer class actions began to be filed. It is the court's understanding that the case at bar is one of approximately 20 consumer class actions filed against Visa and MasterCard in state courts around the country.

Like their counterparts in other states, Knowles and Roberts allege that the unlawful tying of Visa and MasterCard credit and debit cards harmed consumers because the merchants subjected to the allegedly illegal tying arrangement passed the increased costs on to consumers. Neither the class nor plaintiffs' theory of the case is limited to Maine consumers who actually used Visa or MasterCard debit or credit cards. Instead, plaintiffs' theory is that because merchants had to pay artificially inflated amounts as a result of defendants' unlawful tying agreement, the merchants passed those amounts on to all their customers by increasing the price of all retail goods they sold — regardless of whether payment was made by cash, check, credit card, debit card or otherwise. Thus the proposed class in this case consists of all consumers who purchased any item from any Maine merchant who accepted Visa or MasterCard

---

[1] With respect to the merits, the district court noted that the Wal-Mart plaintiffs did not have an open and shut case as to liability. See 297 F.Supp. 2d at 511 (plaintiffs' ability to prove that the "honor all cards" rule was anticompetitive was "no sure thing"). This was particularly true in light of the difficult questions of law involved. See 297 F.Supp. 2d at 510, quoting Hovencamp, Tying Arrangements and Class Actions, 36 Vand.L.Rev. 213, 213 (1983) to the effect that "[f]ew areas of federal antitrust law are more confusing than the law that governs tying arrangements."

during the period from December 1999 to December 2003.

Specifically, the class plaintiffs allege that because Visa and MasterCard credit cards are dominant and ubiquitous, acceptance of these cards is critical to the business success of all or most retail merchants. As a result, plaintiffs contend, Visa and MasterCard were able to require that retail merchants accept Visa or MasterCard debit cards if they wanted to accept Visa or MasterCard credit cards, and were able to impose artificially inflated costs and fees upon the merchants, who then passed on those costs to consumers. Complaint ¶¶ 32, 38-40, 54, 56-58. Plaintiffs allege that Visa and MasterCard were able to set the same fees for their debit cards as for their credit cards even though, in an unrestrained market, debit cards would have commanded lower fees. Complaint ¶¶ 40, 44. Moreover, according to plaintiffs, the particular kind of debit cards which Visa and MasterCard required merchants to accept involved a higher level of credit risk for merchants than other kinds of debit cards offered by entities other than Visa and MasterCard.[2] Id. ¶43.

Plaintiffs further allege that Visa and MasterCard were able to impose a "no discount, no surcharge" policy on retailers. This prevented retailers from either adding a surcharge for the riskier off-line debit cards offered by Visa and MasterCard or giving consumers a discount for paying through a less expensive means, such as cash or an on-line debit card. Complaint ¶7.

One of the named plaintiffs in the case at bar, Diane Roberts, is also a plaintiff in a class action brought in the District of Columbia. Peterson, et al v. Visa U.S.A. Inc., et al., Civil Action No. 03-008080 (D.C. Superior Court, filed Dec. 1, 2003). That action includes claims under the laws of the District of Columbia and seventeen states

---

[2] The Visa and MasterCard debit cards complained of by the class plaintiffs are off-line debit cards, as opposed to on-line debit cards offered by other entities.

4

(including Maine) and seeks to have the District of Columbia court certify a multi-state class action on behalf of consumers from Maine and the 16 other states. In the District of Columbia action, plaintiffs are seeking monetary damages and injunctive relief against Visa and MasterCard's "no discount, no surcharge" policy. D.C. Complaint ¶¶ 187-92. Only monetary damages are sought in the case before this court.[3]

3.     The Contentions of the Parties with respect to Standing

Visa and MasterCard contend that plaintiffs lack standing to pursue their antitrust claims under the rationale of the U.S. Supreme Court's decision in Associated General Contractors v. California State Counsel of Carpenters, 459 U.S. 519 (1983). That decision sets forth various factors to be considered, including the directness of the injury, when determining whether a plaintiff has standing for antitrust purposes. Visa and MasterCard argue that the direct victims of their allegedly unlawful tying scheme (the merchants) have already settled their claims and that an allegation of indirect injury to consumers is insufficient to provide consumers with standing for antitrust purposes.

Plaintiffs have a simple response. They point out that while the U.S. Supreme Court has ruled that under federal antitrust law only direct victims of anti-competitive practices may sue for treble damages, Illinois Brick Co. v. Illinois, 431 U.S. 720, 729 (1977), Maine and a number of other states have passed legislation rejecting the Illinois Brick rule for purposes of their state antitrust laws. Specifically, the Maine legislature amended 10 M.R.S.A. §1104(1) in 1989 to provide a private antitrust treble damage

---

[3] Because of the pendency of the District of Columbia action, plaintiffs originally sought to have this action stayed to await developments in the District of Columbia. Plaintiffs thereafter withdrew their request for a stay. The court agrees that this case should proceed. There is an undoubted benefit in having Maine courts construe Maine's antitrust laws and determine what relief, if any, should be available to Maine consumers.

remedy for any person injured "directly or indirectly in its business or property." See Laws 1989, ch. 367 (emphasis added). The legislative history of this provision demonstrates that the legislature intended to allow "indirect purchasers" to sue manufacturers who had engaged in price-fixing. L.D. 1653, 114th Legis., 1st Sess. (1989). Given this so-called Illinois Brick repealer, plaintiffs argue, federal precedent limiting standing for antitrust purposes is inapplicable in Maine.

The threshold issue on this motion, therefore, involves the legal effect of Maine's Illinois Brick repealer on the issue of antitrust standing.

4.    The Effect of the Illinois Brick Repealer

In considering a motion to dismiss, the court must accept the allegations in the complaint as true. Given their allegations in this case, plaintiffs' argument on standing is straightforward. They argue that the language of 10 M.R.S.A. §1104 (1) as amended by Laws 1989, ch. 367, is unambiguous and expressly permits suits by indirect victims. Under these circumstances, they contend, the court should not go beyond the statutory wording and should conclude that the issue of standing has been legislatively resolved.

In most other contexts, the court would be inclined to agree that the plain wording of the statute would control. However, the court does not agree that it should limit its analysis to the statutory wording in this case for several reasons. First, the U.S. Supreme Court expressly stated that it did not base its ruling in Illinois Brick on standing and observed that the issue of standing and the indirect purchaser rule were "analytically distinct." 431 U.S. at 728 n.7. As a result, the fact that the Maine legislature decided to overrule Illinois Brick on the issue of whether indirect purchasers may assert a remedy does not necessarily resolve the issue of standing.

6

Second, it is well established that the antitrust laws set forth broad general principles and leave the application and elaboration of those principles to the courts. As the U.S. Supreme Court noted in National Society of Professional Engineers v. United States, 435 U.S. 679, 687-88 (1978):

> One problem presented by the language of § 1 of the Sherman Act is that is cannot mean what it says ....
> Congress ... did not intend the text of the Sherman Act to delineate the full meaning of the statute or its application in concrete situations. The legislative history makes it perfectly clear that it expected the courts to give shape to the statute's broad mandate by drawing on common law tradition.[4]

This same language was quoted by the U.S. Supreme Court when it was faced with the task of defining standing for antitrust purposes in Associated General Contractors. 459 U.S. at 531.

Thus, the antitrust laws constitute a broad grant of authority to the courts to fashion a common law of antitrust in furtherance of a general principle to prevent anticompetitive restraints of trade. See, e.g., SAS of Puerto Rico v. Puerto Rico Telephone Co., 48 F.3d 39, 43 (1st Cir. 1995) ("Despite its statutory framework, antitrust law is largely the handiwork of federal judges and antitrust enforcers ...."). In this context, the rule that a court should not look beyond the wording of a statute does not have its usual force. Although the court must heed the legislature's intent in enacting the Illinois Brick repealer, it must recognize that in the particular context of antitrust, statutory wording is only the beginning and not the end of any inquiry.

Notably, when asked at the hearing what standing principles plaintiffs would apply in this case, counsel for plaintiffs directed the court's attention to Justice

---

[4] The specific statutory language referred to in the above-quoted citation, section 1 of the Sherman Act, is mirrored by 10 M.R.S.A. §1101, the provision of Maine antitrust law which plaintiffs allege Visa and MasterCard violated in this case.

Brennan's dissent in Illinois Brick. See Tr. of June 17, 2004 hearing at 36. In that dissent Justice Brennan conceded that "despite the broad wording of [the statute] there is a point beyond which the wrongdoer should not be held liable." 431 U.S. at 760 (Brennan, J., dissenting). See id. at 748 n.2. Although Justice Brennan went on to argue for a liberal rule of standing defined in terms of the "target area" of the violation, id. at 760-61, what is important for present purposes is that he did not dispute that some limits have to be placed on the standing of indirect victims. The wording of the statute, therefore, does not resolve the issue of standing.

5.      Standing under Associated General Contractors

The court is accordingly faced with a choice between the "target area" test for standing espoused by Justice Brennan in Illinois Brick and the Associated General Contractors test adopted by the U.S. Supreme Court in 1983. As the Supreme Court noted in Associated General Contractors, the target area test poses the prospect of "contradictory and inconsistent results." 459 U.S. at 536 n.33. Moreover, the target area test does not take account of prudential concerns that may significantly affect whether specific plaintiffs are proper parties to enforce the antitrust laws. "Although the law is written broadly, the Superior Court's doctrine of antitrust standing has significantly narrowed the number of persons entitled to bring suit." RSA Media, Inc. v. AK Media Group, Inc., 260 F.3d 10, 13 (1st Cir. 2001) (footnote and citations omitted).

Associated General Contractors has remained the template for determining standing under the federal antitrust laws for the past 20 years. See, e.g., Verizon Communications Inc. v. Law Offices of Curtis V. Trinko LLP, 124 S.Ct. 872, 884-85 (2004) (Stevens, J., concurring); RSA Media Inc. v. AK Media Group Inc., 260 F.3d at 13-14. It is probable that the Maine Law Court, if presented with this issue, would look to

8

the Associated General Contractors factors in determining standing under Maine's antitrust laws and would apply those factors except to the extent that those factors cannot be reconciled with the legislature's adoption of the Illinois Brick repealer.

In Associated General Contractors, the U.S. Supreme Court began by observing that standing in an antitrust case is not limited to the requirement of injury in fact but requires a further inquiry to determine whether the plaintiff is a proper party to bring a private antitrust action. 459 U.S. at 535 n. 31. The Court then set forth the following specific factors that must be considered as part of that inquiry:

(1) the causal connection between the plaintiffs' alleged injury and defendants' claimed violation of the antitrust laws. 459 U.S. at 537.

(2) the alleged improper motive of the defendant. 459 U.S. at 537 and n. 35.

(3) the nature of plaintiffs' alleged injury, including whether it is the type Congress sought to redress in the antitrust laws and whether the plaintiff was a consumer or competitor in the market in which trade was restrained. 459 U.S. at 538-39.

(4) the directness or indirectness of the alleged injury. 459 U.S. at 540.

(5) whether there exists a more immediate class of potential plaintiffs whose self-interest could be expected to motivate them to enforce the antitrust laws. 459 U.S. at 541-42.

(6) whether the damages or injuries claimed are speculative. 459 U.S. at 542-43.

(7) whether the complexity of the case can be kept "within judicially manageable limits", avoiding the risk of duplicative recoveries and the danger of complex apportionment of damages. 459 U.S. at 543-44.[5]

---

[5] There are some minor variations in the manner in which courts have summarized the factors set forth in Associated General Contractors. The above represents this court's own distillation of those factors.

9

Looking at these factors in the instant case, it is evident that plaintiffs have adequately pleaded a causal connection and an improper motive. As <u>Associated General Contractors</u> demonstrates, however, those factors alone do not confirm standing if they are outweighed by other factors. <u>See</u> 459 U.S. at 537.

Inquiry with respect to the nature of the alleged injury presents a somewhat closer case. As noted above, <u>Associated General Contractors</u> suggests that one of the subsidiary issues in this inquiry is whether plaintiffs are consumers or competitors in the relevant market. 459 U.S. at 539. The plaintiffs before the court are neither consumers nor competitors in the specific market in which trade was allegedly restrained, which is the market among retail merchants' debit and credit card services. <u>See</u> <u>In re Visa Check/MasterMoney Antitrust Litigation</u>, 2003 U.S. Dist. LEXIS 4965, 8-10 (E.D.N.Y. 2003) (relevant market is among merchants, not consumers). Nevertheless, plaintiffs have adequately alleged an injury of the type that Congress sought to redress. <u>See</u> <u>Blue Shield of Virginia v. McCready</u>, 457 U.S. 465, 483 (1982). Moreover, Maine's adoption of an <u>Illinois Brick</u> repealer further suggests that the court should not deny standing just because plaintiffs are not participants in the actual market where trade was allegedly restrained. This factor weighs in favor of standing.

In light of Maine's <u>Illinois Brick</u> repealer, the next factor — directness or remoteness of the asserted injury — should be disregarded entirely in any inquiry as to standing under Maine's antitrust laws.

The remaining factors are whether there exist more immediate plaintiffs, whether the damages or the injuries are speculative, whether there is a danger of duplicative recoveries, and whether there is a need for complex apportionment. <u>See</u> 459 U.S. at 541-44. These factors are the prudential concerns that have caused federal courts to limit the right of private parties to sue even when a violation exists and the plaintiff has been

damaged. See SAS of Puerto Rico v. Puerto Rico Telephone Co., 48 F.3d at 43. In the court's view, all these factors weigh against standing in this case.

First, there is indisputably a more immediate class of potential plaintiffs motivated to enforce the antitrust laws in this case — namely, the merchants who have already sued and obtained a settlement of more than $3 billion as well as injunctive relief putting an end to the allegedly illegal tying arrangement. See 297 F.Supp.2d 503. This injunctive relief benefits consumers as well as merchants and puts to rest any concern that unless remote plaintiffs are allowed to sue, the antitrust laws will remain unenforced in this case. See Associated General Contractors, 459 U.S. at 542; SAS of Puerto Rico, 147 F.3d at 45. In contrast, if this case presented a situation where potential antitrust violations would remain unredressed unless the parties bringing suit were found to have standing, the case for standing would be immeasurably improved.

Second, both the asserted damages and the chain of causation in this case are speculative. Plaintiffs' contention is that merchants subjected to overcharges as a result of defendants' illegal tying arrangement passed those overcharges on to consumers. To determine what portion of any overcharge was passed on by any given merchant, with respect to which products, and to which consumers is a task of monumental uncertainty and complexity. Depending on their other costs, their competitive position in the market, their profit margins, and the specific products they sold, some merchants could have absorbed a substantial portion of any overcharge instead of passing it on. To a significant extent, whether an overcharge was passed on would depend on the elasticity of demand in the various product markets in which the merchant sells.[6]

---

[6] See, e.g., Illinois Brick Co. v. Illinois, 431 U.S. at 750 n.3 (Brennan, J, dissenting) ("If the market is relatively inelastic, he may pass on a relatively large portion [of any overcharge]. If demand is relatively elastic, he may not be able to raise his price and will have to absorb the increase, making it up by decreasing other costs or increasing sales volume. It is extremely unlikely that a middleman could pass on the entire cost increase. But rarely would he have to absorb the entire increase.").

In this case, where plaintiffs are alleging that retailers raised prices generally and that plaintiffs therefore paid overcharges on every single purchase, see Complaint ¶¶ 7, 46-47, 58, 66, the extent to which damages were incurred by the class would depend on the specific elasticity of demand for any given product sold at retail in the State of Maine by any retailer who accepted Visa or MasterCard credit cards — essentially every product of any kind sold to anyone in the State. While this might be a manageable inquiry if only one product were involved, the complexity of inquiry is geometrically increased when all of the different pricing variables applicable to each and every retail product sold in the state must be considered. For any given consumer, the issue is even more complicated and speculative because the inquiry would involve what items that particular consumer purchased, what that consumer paid for each item, and what percentage of overcharge, if any, was contained in that price.

For example, if plaintiff Diane Roberts purchased a number of items at a Shaw's Supermarket on a specific date during the relevant time period and paid $2.49 for a carton of orange juice, her right to damages would depend on what portion of that $2.49 was attributable to defendants' alleged restraint of trade with respect in providing debit card services to Shaws – as opposed to such factors as competitive pricing by other supermarkets, the wholesale cost of orange juice, labor costs and other overhead, the elasticity of demand for orange juice, and strategic pricing decisions made by Shaw's.[7] Moreover, the same issues would arise for every other item in Ms. Roberts' grocery cart and for every other item that she purchased from any other retailer that day. This process would then need to be repeated for every single day of the alleged four-year damages period.

---

[7] This is a modified version of an example offered by defendants in their memorandum of law.

It might be argued that such an inquiry is not necessary for each consumer because relief can be afforded on a generalized basis once the damage to the class has been determined. But even if no inquiry were required as to the specific damages incurred by each consumer, determination of the damage incurred by the class as a whole would require determining what portion of any overcharge had been passed on to consumers with respect to every item sold in Maine over a four year period by every supermarket, every large retailer, every gas station, every restaurant, and every other merchant that accepted Visa or MasterCard. To say that such an inquiry would be highly speculative and problematic is an understatement.

The remaining Associated General Contractors factors are the danger of duplicative recovery and the problem of complex apportionment. Duplicative recovery is a major issue in this case in light of the more than $3 billion already recovered by the merchants in settlement of the Wal-Mart class actions. If double recovery is to be avoided, a complex apportionment between the damages already recovered by merchants and the damage recoverable by the class will be necessary. As noted above, there would also be a complex apportionment necessary to determine the relief that should be afforded to individual class members. Both those issues have a significant effect on the ability of this case to be kept within "judicially manageable limits." Associated General Contractors, 459 U.S. at 741.

Plaintiffs argue that in light of the Illinois Brick repealer, the court should conclude that the Maine legislature has expressly authorized duplicative recoveries and this factor should therefore not be weighed against them on the issue of standing. The court does not agree. The 1989 amendment to 10 M.R.S.A. §1104 expressly authorizes indirect purchasers to sue but it does not expressly authorize duplicative recoveries. One of the major arguments for allowing indirect purchasers to sue is that in many

13

cases the direct victims of a restraint of trade are reluctant to bring suit and antitrust violations would therefore otherwise go unremedied. Although this rationale justifies eliminating the Illinois Brick bar against suits by indirect purchasers, it does not answer the question of what should happen when the direct victims have in fact already brought suit.

The most forceful opponent of the Illinois Brick ruling – Justice Brennan – believed that double recovery was only a theoretical possibility. Thus in his Illinois Brick dissent, he expressed the view that while arguments based on the potential dangers of double recovery had "some abstract merit", those concerns were unrealistic "as a practical matter." 431 U.S. at 761. See id. at 762-64. To the extent those concerns actually materialized, however, Justice Brennan's dissent makes it clear that he contemplated that duplicative recoveries should be prevented and that apportionment between the direct and indirect victims could and should be made. See 431 U.S. at 761-63. He specifically approved the Ninth Circuit's discussion of the procedural mechanisms available to prevent duplicative recovery in In re Western Liquid Asphalt Cases, 487 F.2d 191, 201 (9th Cir. 1973), cert. denied, 415 U.S. 919 (1974), and he noted that those mechanisms could be used to require antitrust plaintiffs to litigate among themselves "their appropriate shares of the total recovery" in the event that a problem of double recovery was actually presented. 431 U.S. at 763. Thus, if the dissenters had prevailed in Illinois Brick, indirect victims would be able to sue but would not necessarily be entitled to subject defendants to duplicative recoveries.

Other states that have enacted Illinois Brick repealers have provided statutory mechanisms to deal with the problem of duplicative recoveries, in some cases expressly authorizing their courts to take appropriate steps to avoid such recoveries. See Bunkers Glass Co. v. Pilkington PLC, 75 P.3d 99, 108 (Ariz. 2003); Ciardi v. F. Hoffman-LaRoche

Ltd., 762 N.E.2d 303, 321 (Mass. 2002) (Sosman, J., dissenting). While the treatment of potential duplicative recovery when direct and indirect antitrust victims have both brought suit is an unresolved issue under Maine law, the guidance from Justice Brennan's Illinois Brick dissent is that duplicative recovery should at least be prevented to the extent possible. In the court's view, the danger of duplicative recovery and the complex apportionment that may be necessary to avoid such recovery are legitimate factors that must be considered for purposes of antitrust standing. These factors, like the other prudential considerations discussed above, weigh against the standing of the plaintiffs in this case.

In the final analysis, the court has weighed the Associated General Contractors factors and has concluded that notwithstanding Maine's enactment of an Illinois Brick repealer, the factors that militate against standing outweigh those in favor of standing. Accordingly, defendants' motion to dismiss for lack of standing is granted.

In light of its decision that plaintiffs lack standing under Associated General Contractors the court does not have to reach defendants' alternative argument that even if plaintiffs have standing, 10 M.R.S.A. §1104 is only intended to create a remedy for "indirect purchasers" and that the class members here are not indirect purchasers of debit card services. Nor does it have to consider plaintiffs' response that if defendants are correct as to their indirect purchaser argument, plaintiffs should be allowed to

redefine their proposed class to consumers who made purchases with a Visa or MasterCard debit card.[8]

The entry shall be:

     Defendants' motion to dismiss the complaint for lack of standing is granted. The clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: October 20, 2004

                                     Thomas D. Warren
                                     Justice, Superior Court

---

[8] As of the writing of this decision, the court is aware that seven other state trial courts have dismissed consumer antitrust claims brought against Visa and MasterCard based on allegations similar to those asserted in this case. Tackitt v. Visa U.S.A. Inc., No. C103-740, Nebraska District Court, Lincoln County, order filed October 19, 2004; In re Credit/Debit Card Tying Cases, J.C.C.P. No. 4355, California Superior Court, San Francisco County; order filed October 14, 2004; Cornelison v. Visa U.S.A. Inc., Civil No. 03-1350, South Dakota Circuit Court, Pennington County, order filed September 29, 2004; Gutzwiller v. Visa U.S.A. Inc., No C4-04-58, Minnesota District Court, Clay County, order filed September 15, 2004; Beckler v. Visa U.S.A. Inc., Civil No. 09-04-C-00030, North Dakota District Court, Cass County, opinion filed August 23, 2004; Stark v. Visa U.S.A. Inc., No. 03-055030-CZ, Michigan Circuit Court, Oakland County, opinion and order filed July 23, 2004; Ho v. Visa U.S.A. Inc., No. 1123166/00, New York Supreme Court, New York County, order filed April 26, 2004. All of the states in question, like Maine, have enacted Illinois Brick repealers. Some of these decisions have been based on standing, others have been based on the view that the consumers bringing suit did not qualify as indirect purchasers, and some have been based on both grounds.

     Plaintiffs have also directed the court's attention to a preliminary ruling by a trial court in New Mexico expressing the view that the Associated General Contractors test per se is not applicable in New Mexico but that some of the Associated General Contractors factors may nevertheless be relevant to standing under the New Mexico antitrust statute. Nass-Romero v. Visa U.S.A. Inc., No. D0101-CV-200400413, New Mexico District Court, Santa Fe County, transcript of proceedings on September 17, 2004. The New Mexico court invited further briefing on the issue.